UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10098-GAO

WAYNE PELLETIER,
Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
Defendant.

OPINION AND ORDER
March 15, 2012

O'TOOLE, D.J.

Wayne Pelletier appeals the denial of his application for Social Security Disability Insurance ("SSDI") by the Commissioner of the Social Security Administration ("Commissioner").[1] He filed his application on August 17, 2006, alleging disability beginning on July 11, 2006. (Administrative Tr. at 104-08 [hereinafter R.].) His application was denied initially on November 21, 2006, (id. at 46-48), and by a Federal Reviewing Official on November 9, 2007, (id. at 57-64). Pelletier timely appealed to an administrative law judge ("ALJ"), (id. at 77-78), and a hearing was held on September 12, 2009, (id. at 24-45). After the hearing, the ALJ issued a written decision finding that Pelletier was not disabled. (Id. at 10-23.) The Decision Review Board affirmed, (id. at 1-3), making the ALJ's decision the final decision of the Commissioner. Pelletier subsequently appealed to this Court pursuant to 45 U.S.C. § 405(g).

---

[1] Pelletier also purports to appeal the denial of his application for Social Security Income ("SSI") benefits. He filed an application for SSI benefits on August 17, 2006, (R. at 109-11), which was denied because of excess resources, (id. at 65-69). He reapplied on February 9, 2008. (Id. 112-18.) The record, however, does not contain any documents showing what happened to that application. In the end, the omission is irrelevant because the record substantially supports the ALJ's decision and no error of law was made.

Before the Court are cross-motions to reverse, and alternatively to affirm, the decision of the Commissioner. Concluding that the administrative record substantially supports the ALJ's decision and that no error of law was made, the Court now affirms.

## I. Background

Pelletier had previously worked as a baker and an auto technician. (R. at 144-46.) On July 11, 2006, Pelletier was working on a car when a piece of metal flew into his right eye causing him to lose vision in that eye. (Id. at 185-86, 269-71.) This appeal does not seek review of the ALJ's findings with respect to Pelletier's eye injury, but only seeks review of the ALJ's findings with respect to the depression secondary to his eye injury.

### A.   Medical History

Following his eye injury, Pelletier became depressed and began experiencing panic attacks. (Id. at 316-17.) In May 2007, he sought treatment with Elizabeth Velzis, a licensed clinical social worker, at the Family Service Association of Greater Fall River, Inc. ("Family Service Association"). Velzis diagnosed him with a panic disorder with agoraphobia and a mood disorder, not otherwise specified. (Id. at 317.) She assigned him a global assessment of functioning score ("GAF") of fifty-one, (id.), suggesting a moderate difficulty in social, occupational, or school functioning, Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) [hereinafter DSM-IV].

Dr. Jean K. Boyd completed a Consultative Examination Report for the Massachusetts Rehabilitation Commission Disability Determination Services on June 21, 2007. (R. at 242-45.) Pelletier informed Dr. Boyd that he could perform activities of daily living without difficulty, but that he shared household duties with his live-in girlfriend. (Id. at 244.) He also stated that he "constantly" felt depressed. (Id.) Dr. Boyd found that Pelletier displayed signs of a mild depressive reaction secondary to his eye injury. Dr. Boyd assigned him a GAF score of forty-

two, (id. at 245), indicative of serious symptoms or a serious impairment in social, occupational or school functioning, DSM-IV 34.

Pelletier returned to Family Service Association for a quarterly review in July 2007. (Id. at 250.) During this quarterly review, Velzis recorded in her treatment notes that Pelletier's condition had improved. (Id.) He no longer suffered from daily panic attacks, but would experience attacks only once per week; his mood, motivation, and energy level had improved while his depressive thoughts had decreased; and he slept an average of five hours per night. (Id.)

Pelletier also saw Velzis for five, sixty-minute counseling sessions between October 11, 2007 and December 13, 2007. (Id. at 260-64.) Velzis' treatment notes indicate that Pelletier was "making progress," (id. at 261), and that his medication was reducing his anxiety and decreasing the intensity of panic attacks, (id. at 260).

In addition to his counseling sessions with Velzis, Pelletier had periodic, fifteen minute medication reviews with Dr. Douglas H. Griffiths of Family Service Association between September 2007 and January 2008. (Id. at 265-67.) Dr. Griffiths noted that his anxiety had "improved," (id. at 265), and that his "panic feelings are managed," (id. at 266). Dr. Griffiths completed a Medical Source Statement of Ability to Do Work Related Activities (Mental) ("Medical Source Statement") on February 28, 2008, in which he opined that Pelletier had moderate limitations in his ability to understand, remember, and carry out simple instructions, make judgments on simple work-related decisions, interact appropriately with the public and co-workers, and maintain socially appropriate behavior; marked restrictions in his ability to understand, remember, and carry out complex instructions, maintain concentration for an extended period of time, interact with supervisors, and respond appropriately to usual work situations; and an extreme restriction in his ability to make judgments on complex work-related decisions. (Id. at 268.)

Pelletier had quarterly reviews in October 2007 and January 2008. (Id. at 292-93.) In October, Velzis noted that his anxiety had decreased, no panic attacks had occurred in two weeks, and that he slept an average of seven hours per night. (Id. at 293.) In January, however, Velzis reported that his anxiety and depressed mood had gotten worse, that his panic attacks continued on an irregular basis, and that his alcohol consumption had increased after Pelletier learned that the Commissioner denied his application for SSDI. (Id. at 292.)

Between January and June 2008, Pelletier had another twelve, sixty-minute counseling sessions with Velzis. (Id. at 301-15.) Velzis noted that he showed a "mild improvement" or a "moderate improvement" after eight sessions. (Id.)

Velzis also completed a Medical Source Statement. (Id. at 300.) She opined that Pelletier had no restriction in his ability to understand, remember, and carry out simple instructions or to maintain socially appropriate behavior; mild restrictions in his ability to make judgments on simple work-related decisions, interact appropriately with supervisors and co-workers, and to respond appropriately to usual work situations; moderate restrictions in his ability to make judgments on complex work-related decisions and to interact with the public; and marked restrictions in his ability to understand, remember, and carry out complex instructions and to maintain concentration for an extended period of time. (Id.)

B.   Pelletier's Testimony

Pelletier testified at the hearing about the intensity, persistence, and functionally limiting effects of his depression. He stated that he could not work because of "social fear," (id. at 27), and that it was "tough leaving the house," (id. at 30). Yet, Pelletier also testified that he goes for thirty-minute walks every day, (id.), sits under a tree to mediate and practice his coping exercises, (id.), and goes fishing weekly or biweekly with a friend, (id. at 31).

4

Pelletier testified that he tried to enlist the assistance of the Massachusetts Vocational Rehabilitation office, but "the social phobia took over." (Id. at 29.) He, however, conceded that he previously told Velzis that he could not use the office because of the hearing before the ALJ. (Id. at 33.) Pelletier could not explain how the hearing affected his ability to use the office. (Id.)

He testified that he did not do any household chores, (id. at 30), but conceded that he previously told Velzis that he tried to stay busy by spring cleaning including vacuuming and dusting his house, (id. at 32). He testified that he stopped exercising with weights when he injured his eye in July 2006, but then conceded that he had reported exercising with weights in November 2007. (Id.) He also testified that he had stopped drinking after he started seeing Dr. Griffiths in May 2007, but had reported in January 2008 that he was drinking approximately twenty-one beers a week. (Id. at 34-35.)

C.    ALJ's Findings

The ALJ concluded that Pelletier's testimony was not credible, (id. at 19-20); she also concluded that the opinions expressed by Dr. Griffiths and Velzis in their Medical Source Statements were not entitled to "substantial probative weight," (id. at 21).

Based on the remaining evidence, the ALJ found that Pelletier retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the mental restrictions of (1) a moderate limitation in concentration, persistence and pace such that he can understand, remember and carry out simple 1-2-3 step tasks not involving independent judgment making over an eight hour day with appropriate breaks; and (2) a moderate limitation in social interactions, requiring an object or material focused job that entails only occasional work related interactions with supervisors, co-workers, and the public. (Id. at 16-17.) The ALJ also found that Pelletier could not perform his past relevant work, but that he could perform jobs existing in significant numbers in the national economy including material handler, general

5

cleaner, machine tender, assembly and packaging, and hand packager. (Id. at 21-22.) Accordingly, the ALJ held that Pelletier was not disabled. (Id. at 23.)

**II.     Discussion**

    A.    Opinions of Treating Psychiatrist and Therapist

Pelletier asserts that the ALJ failed to comply with 20 C.F.R. § 404.1527(d) and Social Security Rulings 96-2p and 06-03p before discounting the opinions of his treating psychiatrist, Dr. Griffiths, and treating therapist, Velzis.

The opinions of treating sources, i.e., "acceptable medical sources" with whom the claimant has an ongoing treatment relationship, must always be carefully considered by the ALJ. Where, as here, the opinion is not entitled to controlling weight,[2] the opinion is "still entitled to deference." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996). The degree of deference afforded is determined using the factors provided in 20 C.F.R. § 404.1527(d)(2) including: the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; supportability; consistency; and specialization. The opinions of non-medical sources, such as licensed clinical social workers, with whom the claimant has an ongoing relationship should be evaluated using the same factors. SSR 06-3p, 2006 WL 2329939, at *4 (Aug. 9, 2006).

The ALJ determined that the opinions of Dr. Griffiths and Velzis had little probative value because they were not supported by and were not consistent with the record. Pelletier asserts that the ALJ erred by not explicitly discussing each factor under 20 C.F.R. § 404.1527(d)(2) before making this determination. That assertion lacks merit. An ALJ need not "slavishly discuss every one of those factors in his or her decision." Moore v. Astrue, No. 06-

---

[2] Pelletier does not contend that the ALJ should have given Dr. Griffiths' opinion controlling weight, and he could not argue that Velzis' opinion should have be given controlling weight because, as a licensed clinical social worker, she is not an "acceptable medical source" whose opinions may be given controlling weight. See SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

136, 2007 WL 2021919, at *6 (D. Me. July 11, 2007). An ALJ need only provide "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Good reasons can be provided by discussing just one factor. See, e.g., Green v. Astrue, 588 F. Supp. 2d 147, 155 (D. Mass. 2008) (discussing only consistency).

Alternatively, Pelletier contends that the ALJ did not give "good reasons" for discounting the opinions of Dr. Griffiths and Velzis because she failed to explain how their opinions were inconsistent with the record. Although the ALJ did not provide specific examples of inconsistency, that omission is not fatal because their opinions were inconsistent with the entire record as outlined in the ALJ's decision. Pelletier's treatment records, the primary source of evidence concerning his depression, showed that he was assessed a GAF score of fifty-one in July 2007,[3] indicating that his depression caused a moderate limitation in social and occupational functioning. The records then show a steady improvement between July 2007 and August 2008. In August 2008, Velzis assessed Pelletier had a GAF of 55. (R. 324.)

The opinions of Dr. Griffiths and Velzis contravene this empirical data. They opined that his depression caused marked and/or extreme limitations in social and occupational functioning when all empirical data showed that he started with a moderate limitation and improved. Inconsistency with all empirical data constitutes a "good reason" for discounting the opinions Dr. Griffiths and Velzis. To remand and require the ALJ to repeat these inconsistencies more explicitly, when they are clearly set out in her decision, would be an exercise in futility.

B.   Credibility of the Claimant

Pelletier claims that the ALJ erred in assessing his credibility. He contends that the ALJ did not follow the procedure set forth in Avery v. Secretary of Health & Human Services, 797

---

[3] A GAF score, contrary to Pelletier's assertion, need not be assessed in a work environment to indicate an individual's ability to function in a work environment. See DSM-IV 34 (noting that a GAF score between fifty-one and sixty indicates a moderate difficultly in occupational functioning).

F.2d 19 (1st Cir. 1986), and Social Security Ruling 96-7p when evaluating his statements about his symptoms and finding them not credible.

The ALJ need not take the claimant's statements about the intensity, persistence, and functionally limiting effects of his symptoms at face value. See Bianchi v. Sec'y of Health & Human Servs., 764 F.2d 44, 45 (1st Cir. 1985). Where, as here, the medical treatment record does not support the claimant's statements, the ALJ must assess the claimant's credibility. See SSR 96-7p, 1996 WL374186, at *2 (July 2, 1996). The ALJ must investigate all evidence that relates to the claimant's statements when assessing credibility. See Avery, 797 F.2d at 23. Specifically, the ALJ must consider the so-called Avery factors including: the nature, location, onset, duration, frequency, radiation, and intensity of the reported pain; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; any treatment, other than medication, for relief of pain; the claimant's functional restrictions; and the claimant's daily activities.

If after weighing all of the evidence the ALJ determines that the claimant's statements lack credibility, she "must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986). A credibility determination supported by specific findings will not be disturbed. Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).

Pelletier perceives error in the ALJ's failure to explicitly discuss the Avery factors in her written decision. While an explicit discussion of the Avery factors is preferable, the ALJ complies with Avery if it is clear that all factors were considered. See id. at 194; Lopes v. Barnhart, 372 F. Supp. 2d 185, 192 (D. Mass. 2005). The ALJ may not have explicitly discussed the Avery factors, but her decision touches on them such that it is clear that she gave due consideration to them. As to the first Avery factor, the ALJ described the nature, onset,

frequency, and intensity of Pelletier's depression, anxiety, and difficultly sleeping by summarizing his treatment records from his first visit to the Family Service Association in May 2007 until August 2008. Pelletier now contends that this summary does not "fairly reflect the severity of [his] symptoms highlighted in the treatment notes" or "discuss [his] ongoing symptoms nor the chronic exacerbation of the multiple symptoms that impeded his progress," (Pl.'s Mem. of Law in Supp. of Reversal of Comm'r's Denial of Benefits 16); however, this contention does not justify reversal because Pelletier points to no evidence ignored by the ALJ, see Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 42 (1st Cir. 2006) (noting that the plaintiff must direct the court's attention to evidence in support of his arguments).

As to the second Avery factor, the ALJ recognized that the denial of Pelletier's application for SSDI aggravated his symptoms. As to the third Avery factor, Pelletier asserts that the ALJ ignored the drowsiness caused by Klonopin. This assertion is contrary to fact. The ALJ stated that Pelletier took "Paxil, Clonozepam[4] [sic] and Wellbutrin," (R. at 19), and that he testified that "his medication makes him tired and dizzy," (id. at 17). As to the fourth Avery factor, the ALJ mentioned his regular counseling sessions with Velzis and the exercise, coping skills, and relaxation techniques used to control his symptoms. As to the fifth Avery factor, the ALJ cited Pelletier's claimed functional limitations of social fear and difficultly leaving the house, but found the limitations to be contradicted by his daily activities.

As to the final Avery factor, Pelletier concedes that the ALJ discussed his daily activities, but suggests that the ALJ improperly equated these activities with an ability to perform substantial gainful activity. Pelletier is correct that the claimant's ability to perform limited daily activities does, not in and of itself, prove that he has the ability to perform substantial gainful activity. See Dedis v. Chater, 956 F. Supp. 45, 54 (D. Mass. 1997); see also 20 C.F.R. §

---

[4] Clonazepam is the generic name for Klonopin. Physician's Desk Reference 2639 (63rd ed. 2009).

404.1572(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity."). But Pelletier's argument falls flat because the ALJ did not equate his daily activities with substantial gainful activities. She used the daily activities precisely as Avery requires: to determine whether Pelletier's statements were credible. That is, the ALJ considered his daily activities to determine whether the activities reasonably reflected the symptoms he described. She concluded that they did not.

Pelletier argues that even if the ALJ considered the Avery factors, she erred by not also acknowledging his solid work history which he contends bolsters his credibility. Although the ALJ must investigate all evidence relating to the claimant's statements, see Avery, 797 F.2d at 23, she can do so "without directly addressing in [her] written decision every piece of evidence submitted by a party," NLRB v. Beverly Enters.-Mass., 174 F.3d 13, 26 (1st Cir. 1999). The ALJ knew about Pelletier's work history. (R. at 38.) The decision to emphasize certain factors over others was a decision for the ALJ, not the reviewing court, to make. See Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 221 (1st Cir. 1981) ("[T]he resolution of conflicts in the evidence . . . is for the [ALJ], not for the doctors or for the courts.").

After considering all of the Avery factors, the ALJ gave three specific reasons for her determination that Pelletier's testimony was not credible: (1) he made numerous inconsistent statements; (2) his statements were inconsistent with the record medical evidence; and (3) his activities of daily living belied the severity of the symptoms alleged.

The first reason alone justifies the ALJ's decision to find Pelletier's statements not credible. When "evaluating the claimant's credibility, the ALJ is entitled to consider the consistency and inherent probability of the testimony." Frustaglia, 829 F.2d at 195 n.1 (internal quotation omitted); see also SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the

10

credibility of an individual's statements is their consistency, both internally and with other information in the case record."). The ALJ is entitled to discount the claimant's statements if inconsistencies exist. <u>Frustaglia</u>, 829 F.2d at 195 n.1. Here, the ALJ noted that "certain of the claimant's statements are inconsistent and undermine his credibility." (R. at 20.) She identified two specific examples: he testified at the hearing that he had stopped drinking when he began treatment with Dr. Griffiths, but the record showed that he had been drinking approximately twenty-one beers a week in January 2008; and he testified at the hearing that he did not pursue working with the Massachusetts Vocational Rehabilitation office because of his social phobias, but the record showed that he told Velzis that he was unable to use the office because of his pending social security claim. (<u>Id.</u>)

Having complied with the procedure set forth in <u>Avery</u> and Social Security Ruling 96-7p, the ALJ properly found Pelletier's statements not to be credible.

### C. RFC Assessment

Pelletier argues that the ALJ's RFC assessment was not supported by substantial evidence as a result of the two errors discussed above, i.e., failure to properly weigh treating sources' opinions and failure to properly assess the claimant's credibility. Because those two arguments lack merit, this argument too lacks merit.

## III. Conclusion

For the foregoing reasons, the plaintiff's Motion for Order Reversing the Decision of the Commissioner (dkt. no. 13) is DENIED and the defendant's Motion for an Order Affirming the Decision of the Commissioner (dkt. no. 15) is GRANTED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge